UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

JACK RILEA SLINEY,

               Petitioner,

vs.                        Case No.  2:06-cv-670-FtM-36SPC

SECRETARY, DOC and FLORIDA ATTORNEY
GENERAL,

               Respondents.[1]

_____

**OPINION AND ORDER**

This matter is before the Court upon review of Petitioner Jack Rilea Sliney's (hereinafter "Petitioner" or "Sliney") Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2254 (Doc. #1, Petition), filed December 18, 2006.[2]  The Respondent filed a Response in Opposition to Petition (Doc. #20, Response), supported by exhibits (Doc. #21, Exh.).  Despite the Court's November 7, 2008, and August

_____

[1]The Petition names the Secretary of the Florida Department of Corrections and the Florida Attorney General as  Respondents. Petition at 1.  The Supreme Court has made clear that there "is generally only one proper respondent to a given prisoner's habeas petition."  *Rumsfield v. Padilla*, 124 S. Ct. 2711, 2717 (2004). This is "the person with the ability to produce the prisoner's body before the habeas court."  *Id.*  In this case, the proper party Respondent is the Secretary of the Florida Department of Corrections.  Consequently, the Court will *sua sponte* dismiss the Florida Attorney General as a named Respondent.

[2]Although the Petition references exhibits consisting of the trial court and post-conviction records, Petitioner never filed any exhibits with this Court.  Respondent references the same post-conviction records; thus, the Court refers to Respondent's submitted exhibits.

5, 2009 Orders, Petitioner did not file a Reply to the Response and the time to do so has expired.  *See* docket.

Upon review of the file, the Court determines that the federal habeas petition should be dismissed in part, as procedurally defaulted, and that relief should otherwise be denied.

## I. Procedural History

### A.  Trial and Sentence

On July 31, 1992, Sliney and his co-defendant, Keith Hartley Witteman, were each charged with one count of conspiracy to commit first degree murder in the Twentieth Judicial Circuit Court, Charlotte County, Florida.  Exh. A1 at 1.  On September 3, 1992, the Charlotte County Grand Jury indicted Sliney and his co-defendant each for one count of first-degree premeditated murder, one count of first-degree felony murder, and one count of robbery with a deadly weapon for the murder and robbery of George Blumberg (hereinafter "George" or "victim").  *Id.* at 4-5.

Petitioner entered a not guilty plea, and a jury trial before the Honorable Donald E. Pellecchia commenced on September 27, 1993.  Exh. A4-A12.  The Florida Supreme Court summarized the underlying facts on Petitioner's direct appeal as follows:

The victim in this case, George Blumberg, and his wife, Marilyn Blumberg, owned and operated a pawn shop.  On June 18, 1992, Marilyn drove to the pawn shop after unsuccessfully attempting to contact George by phone.  When she entered the shop, she noticed that the jewelry cases were empty and askew.  She then stepped behind the store counter and saw George lying face down in the bathroom with scissors protruding from his

neck.[3]  A hammer lay on the floor next to him.  Marilyn called 911 and told the operator that she thought someone had held up the shop and killed her husband.

A crime-scene analyst who later arrived at the scene found, in addition to the hammer located next to the victim, parts of a camera lens both behind the toilet and in the bathroom wastepaper basket.  The analyst also found traces of blood and hair in the bathroom sink.  The only relevant fingerprint found in the shop belonged to codefendant Keith Witteman.

During the autopsy of the victim, the medical examiner found various injuries on the victim's face; three crescent-shaped lacerations on his head; three stab wounds in his neck, one of which still contained a pair of scissors; a number of broken ribs; and a fractured backbone.  The medical examiner opined that the facial injuries occurred first and were caused by blunt trauma.  When asked whether the camera lens found at the scene could have caused some of the victim's facial injuries, the medical examiner responded affirmatively.  The stab wounds, the medical examiner testified, were inflicted subsequent to the facial injuries and were followed by the three blows to the head.  The medical examiner confirmed that the three crescent-shaped lacerations found on the victim's head were consistent with the end of the hammer found at the scene.  Finally, the medical examiner opined that the broken ribs and backbone were the last injuries the victim sustained and that the cause of these injuries was most likely pressure applied to the victim's back as he lay on the ground.

The day after the murder, Keith Dale Dobbins came forward indicating that the he might have seen George Blumberg's assailants.  Dobbins had been in the pawn shop on June 18, 1992, and prior to his departure, he saw two young men enter the shop.  The two men approached George and began discussing a piece of jewelry that they apparently had discussed with him on a prior occasion.

Dobbins saw the face of one of the men as the two walked past him.  Based on the description Dobbins gave, investigators drew and circulated a composite of the

---

[3]The scissors were inserted in the victim's neck so deeply that only the orange handles of the scissors remained outside of the victim's body.

suspect.    One   officer   thought   his   stepdaughter's
boyfriend, Thaddeus Capeles, might recognize the suspect
because Capeles and the suspect appeared to be close in
age.  The officer showed Capeles the composite as well as
a picture of the gun that had been taken from the
Blumberg's pawn shop.   Capeles did not immediately
recognize the person in the composite but later contacted
the officer with what he believed to be pertinent
information.    Capeles told the officer that when he
visited the Club Manta Ray, Jack Sliney, who managed the
teen club, asked him whether he was interested in
purchasing a gun.  He thought the gun Sliney showed him
looked somewhat like the one in the picture the officer
had shown him.

The officer arranged a meeting between Capeles and Carey
Twardzik, an investigator in the Blumberg case.  During
the meeting, Capeles agreed to assist with the
investigation. At Twardzik's direction, Capeles arranged
a controlled buy of the gun Sliney had showed him.  His
conversations with Sliney, both on the phone and at the
time he purchased the gun, were recorded and later played
to the jury.  After discovering that the serial number on
the gun matched the number on a firearms register from
the Blumbergs' pawn shop, investigators asked Capeles to
arrange a second controlled buy of some other guns Sliney
mentioned during the most recent conversation with
Capeles.  Capeles' conversations with Sliney regarding
the second sale, like the conversations surrounding the
initial sale, were recorded and later played for the
jury.  As with the first sale, the serial numbers of the
guns Capeles obtained matched the firearms register
obtained from the Blumbergs' shop.  At trial, Marilyn
Blumberg identified the guns Sliney sold Capeles and
confirmed that they were present in the pawn shop the day
prior to the murder.

Shortly after the second gun transaction, several
officers arrested Sliney.  The arrest occurred after
Sliney left Club Manta Ray, sometime between 1 and 1:45
a.m.  At the time of the arrest, codefendant Keith
Witteman and a female were also in Sliney's truck.
Despite the testimony of several defense witnesses to the
contrary, the arresting officers testified that Sliney
did not appear to be drunk or to have any difficulty in
following the instructions they gave him.

Following the arrest, Sliney was taken to the sheriff's department.  Officer Twardzik read Sliney his *Miranda*[4] rights, and Sliney thereafter indicated that he wanted to talk.  He gave both written and taped statements in which he confessed to the murder.  In his taped statements which was played to the jury, Sliney told the officers that shortly after he and Keith Witteman entered the shop, they began arguing with George Blumberg about the price of a necklace Sliney wanted to buy.  According to Sliney, Witteman pressured him to hit Blumberg.  Sliney grabbed Blumberg, and Blumberg fell face down on the bathroom floor.  Sliney fell on top of Blumberg.  Sliney then turned to Witteman and asked him what to do.  Witteman responded, "You have to kill him now," and began taking things from the display cases and placing them in a bag.  Thereafter, Sliney recalled hitting Blumberg in the head with a camera lens that Sliney took from the counter and stabbing Blumberg with a pair of scissors he obtained from the drawer.  Sliney was somewhat uncertain of the order in which he inflicted these injuries.  Next, he recalled removing a hammer from the same drawer in which the scissors were located and hitting Blumberg on the head several times.

Sliney left Blumberg on the floor.  He washed his hands in the bathroom sink, and then he and Witteman left the shop.  According to Sliney, Witteman, in addition to taking merchandise from the shop, took money from the register and the shop keys from Blumberg's pocket.  He used the keys to lock the door as the two exited the shop.

Before returning home,[5] Sliney and Witteman disposed of several incriminating items and transferred the jewelry they obtained from the shop, as well as a .41 caliber revolver,[6] into a gym bag.  Sliney put the bag in a trunk in his bedroom.  Officers conducting a search of Sliney's home later found the gym bag containing the jewelry and gun.

---

[4]*Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966)

[5]Both Sliney and Witteman lived with Sliney's parents.

[6]This gun was not listed on the firearm register found in the Blumbergs' shop.

In addition to recounting circumstances surrounding the murder, Sliney told the officers that he had been in the pawn shop prior to the murder. He said, however, that he did not decide to kill Blumberg before entering the shop or at the time he and Blumberg were arguing. Rather, he told them that he did not think about killing Blumberg until Witteman said, "We can't just leave now. Somebody will find out or something. We got to kill him."

Prior to trial, Sliney moved to suppress the statements he made to the law enforcement officers. He alleged that the statements were involuntary and thus inadmissible. The trial court denied the motion. At trial, Sliney presented several witnesses to the jury in support of his position that his confession was untrustworthy. Sliney also testified on his own behalf. His testimony was inconsistent with his statements he made to law enforcement officers. He testified that it was actually Witteman who murdered Blumberg. Sliney told the jury that he paid for the necklace he was looking at before he began arguing with Blumberg over the price. During the argument he grabbed Blumberg, and Blumberg fell to the floor. When he saw that Blumberg was bleeding, he left the shop. He went to lay down in his truck because the sight of blood made him sick. Several minutes later, Witteman came out to the truck. He removed a pair of weight lifting gloves from Sliney's gym bag and then went back into the shop. When Witteman exited the shop again he had with him a gun and a pillow case full of things. Sliney explained that he did not go to the police when he discovered that Blumberg was dead because Witteman threatened to harm his family.

*Sliney v. State*, 699 So. 2d 662 (Fla. 1997)(internal footnotes included); Exh. A17. On October 1, 1993, Sliney's jury returned a guilty verdict for the first-degree murder charge. The penalty phase was scheduled to begin on October 4, 1993, but the Court granted Petitioner's motion to discharge his privately retained attorney, Kevin Shirley, granted a one-month continuance of the

penalty phase, and reappointed the initial assistant public defender assigned to the case, Mark Cooper. Exh. A2 at 221.

On November 4, 1993, the trial court commenced the penalty phase and the jury heard evidence in support of aggravating and mitigating factors. *Id.* The jury returned a seven to five vote in favor of the imposition of a death sentence on Petitioner for the first-degree murder of George Blumberg.

On February 14, 1994, the trial judge sentenced Petitioner to death on the first-degree murder conviction. The trial judge found grounds for an upward departure on Petitioner's robbery conviction and sentenced him to life. *See State v. Sliney*, Case No. 92-451CF (Fla. 20th Cir. Ct. sentencing order filed Feb. 14, 1994); Exh. A2 at 221-227. With regard to the death penalty, the judge identified two statutory mitigating factors,[7] six nonstatutory mitigating factors,[8] and two aggravating factors.[9]   *See* Exh. A2. The court

---

[7]The statutory mitigating factors were: Petitioner had no significant history of prior criminal activity; and, Petitioner was at a youthful age at the time the crime was committed. Exh. A2.

[8]The non-statutory mitigating factors the court considered were that Petitioner: was a good prisoner (accorded some weight); was polite and mild-mannered (accorded little weight); was a good neighbor (accorded little weight); was a caring person (accorded little weight); had a good school record (accorded little weight); was gainfully employed (accorded little weight). Exh. A2.

[9]The two aggravating factors the court considered were that Petitioner: committed the murder while engaged in or was an accomplice in the commission of a robbery; and, the murder was committed for the purpose of avoiding or preventing a lawful arrest. Exh. A2.

rejected Petitioner's request to consider his confession as a mitigating factor because Petitioner had claimed that the confession was involuntary. *Id.* The trial judge recognized that Petitioner's co-defendant received a life sentence for the crimes, but found that the two defendants were not equally culpable.[10] *Id.* at 226.

**B.  Direct Appeal**

Petitioner filed a direct appeal of his conviction and sentence raising the following ten grounds of trial court error: (1) Petitioner's confession was involuntary and should have been suppressed; (2) the trial court erred in admitting into evidence portions of the transcript of Marilyn Blumberg's 911 call; (3) the trial court erred in allowing the jury to hear taped conversations between Capeles and Petitioner, which included racial epithets; (4) the firearms register from the Blumbergs' pawn shop constituted inadmissible hearsay; (5) the trial court erred in excluding testimony from several inmates to whom Witteman admitted killing Blumberg; (6) the trial court erred in refusing to appoint an investigator to research mitigating evidence and in failing to allow the public defender adequate time to prepare for the penalty proceeding; (7) the trial court erroneously found both aggravating

---

[10]Judge Pellecchia was the presiding judge during the respective criminal trials of both Sliney and Witteman. The transcript of Witteman's sentencing hearing is also contained within the record before the Court. Exh. A13 at 69.

factors; (8) death is disproportionate; (9) the trial court erred in giving an upward departure sentence for the armed robbery count; (10) the trial court improperly assessed fees and costs against Petitioner.  Exh. A14 (direct appeal brief); *see also* Exh. A17-*Sliney v. State*, 699 So. 2d 662, 667 (Fla. 1997).

The Florida Supreme Court affirmed Petitioner's conviction and sentences and denied his appeal.  Exh. A17, *Sliney*, 699 So. 2d 662. Petitioner moved for rehearing, but the Court denied the motion. Exhs. A18-A19.  Petitioner then filed a petition for writ of certiorari with the United States Supreme Court, which was denied on February 23, 1998.  Exh. B1, *Sliney v. State*, 522 U.S. 1129 (Feb. 23, 1998); Exh. B3.

### C. State Post-Conviction Proceedings

On February 16, 1999, Petitioner, proceeding *pro se*, filed his first post-conviction motion.  Exh. C0.  On March 29, 1999, appointed counsel filed an amended motion for post-conviction relief on behalf of Petitioner.  Exh. C1 at 10.  On June 19, 2001, Petitioner, through counsel, filed a consolidated post-conviction motion pursuant to Fla. R. Crim. P. 3.850 (hereinafter "Consolidated Rule 3.850 Motion").[11]  Exh. C1 at 110-151.

---

[11]From March 1999, when the first post-conviction motion was filed, to June 2001, when the consolidated post-conviction motion was filed, the record shows several continuances and a status conference held before the post-conviction trial court. *See* Exh. C1.

Petitioner's Consolidated Rule 3.850 motion raised the following six grounds for relief: (1) trial counsel was ineffective for failing to investigate, develop, and present a defense of voluntary intoxication based on Petitioner's alcohol and steroid use; (2) trial counsel was ineffective for failing to investigate, develop, and present evidence of compelling statutory and nonstatutory mitigating factors regarding Petitioner's alcohol and steroid use; (3) the trial court unconstitutionally shifted the burden of proof in its instructions to the jury at sentencing; (4) trial counsel was ineffective for failing to properly examine the jury during *voir dire*; (5) trial counsel was ineffective for failing to move for a change of venue; and (6) the defendant was denied a fair trial due to the cumulative effect of the errors made in his trial. *Id.* The State filed a Response. *Id.* at 157. On April 29, 2002, the post-conviction court held an evidentiary hearing regarding all the aforementioned claims. Exh. C2 at 252, 274, 282.

On May 23, 2002, the State moved to supplement the record to include a 1992 report from the Florida Department of Law Enforcement to rebut Petitioner's claim that trial counsel rendered ineffective assistance of counsel for failure to investigate or develop Sliney's steroid use. Exh. C4 at 515. The post-conviction court reserved ruling on the State's motion to supplement until it could hold a supplementary evidentiary hearing. *Id.* The post-

conviction court scheduled the supplementary evidentiary hearing, which was canceled and rescheduled, as were several other hearings. Exh. C4 at 535.  On May 9, 2003, the post-conviction court held a supplementary evidentiary hearing and again reserved ruling on the State's motion.[12]  *Id.* at 564.

On June 19, 2003, Petitioner filed a motion to amend his Consolidated Rule 3.850 Motion to include a seventh ground for relief.  *Id.* at 625.  Petitioner requested permission from the post-conviction court to include a claim that trial counsel, Kevin Shirley, had a conflict of interest in representing Sliney and failed to inform him of the conflict.  *Id.*  In pertinent part, Petitioner alleged that trial counsel had previously represented a prosecution witness in the case, Lloyd Hamilton Sisk, in a civil case that pre-dated Petitioner's criminal trial.  *Id.*  Petitioner also asserted that counsel had represented Sisk's son in a divorce proceeding that pre-dated Petitioner's criminal trial.  *Id.*  The State filed a Response in opposition to the motion to amend.  Exh. C5 at 714.  On August 20, 2003, the post-conviction court granted Petitioner's motion to amend, directed him to file his amended

---

[12]A thorough review of the record did not uncover the court's decision regarding the State's motion to supplement.  The post-conviction court's final order denying Petitioner relief on all claims indicates that the court denied the State's motion to supplement the record to contain evidence that the steroid vials found in Petitioner's room did not contain steroids.  Exh. C6 at 935-936.

motion pursuant to Rule 3.850, and scheduled a second supplementary evidentiary hearing.  Exh. C5 at 832.

On December 2, 2003, the post-conviction court held its second supplementary evidentiary hearing.  *Id.* at 898-932.  On December 14, 2004, the post-conviction court entered an order denying Petitioner relief on all grounds raised in both his June 19, 2001 Consolidated Rule 3.850 Motion and subsequently filed amended motion.  Exh. C6 at 933-960, *State v. Sliney*, Case No. 92-451CFA-DEP (Fla. 20th Jud. Cir. Dec. 14, 2004).

Petitioner appealed the post-conviction court's order of denial to the Florida Supreme Court raising the following two claims on appeal: (1) trial counsel rendered ineffective assistance of counsel due to a conflict of interest; and (2) trial and penalty phase counsel rendered ineffective assistance for failing to investigate and present mitigating evidence.  Exh. C8 at 1-57.  The State filed a Response.  Exh. C9.

In the meantime, Petitioner also filed a state petition for writ of habeas corpus, arguing that appellate counsel rendered ineffective assistance on direct appeal by failing to raise the following errors: (1) the State's repeated introduction of collateral crime evidence at trial; (2) the State's introduction of irrelevant and prejudicial hearsay testimony at trial; (3) the prosecutor's fundamental misstatements of law and fact to the jury. Exh. C11.  The State filed a response in opposition to the motion.

-12-

Exh. C12.   On November 9, 2006, the Florida Supreme Court denied Petitioner relief on all grounds raised on appeal and in his state habeas petition.   Exh. C13, *Sliney v. State*, 944 So. 2d 270 (Fla. 2006).

## II.   Current Petition

On December 18, 2006, Petitioner filed his federal Petition, arguing that his conviction and death sentence are in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. Petition at 3.   The Petitioner raises the following six grounds for relief:

(1) Trial counsel rendered ineffective assistance by failing to adequately investigate, develop, and present a defense of involuntary intoxication;

(2) Trial counsel, during the penalty phase, rendered ineffective assistance by failing to investigate, develop, and present evidence establishing compelling statutory and non-statutory mitigating factors;

(3) The trial court erred by unconstitutionally shifting the burden of proof in its instructions at sentencing;

(4) Trial counsel rendered ineffective assistance of counsel by failing to exercise jury challenges during *voir dire*;

(5) The cumulative effects of trial counsel's ineffective assistance and the trial court's errors resulted in unreliable convictions;

(6) Trial counsel rendered ineffective assistance due to an actual conflict of interest that adversely affected his performance.

*See generally* Petition.

### III.   Applicable § 2254 Law

Because Petitioner filed his § 2254 Petition after April 24, 1996, this case is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *Abdul-Kabir v. Quarterman*, 127 S. Ct. 1654, 1664 (2007); *Penry v. Johnson*, 532 U.S. 782, 792 (2001).  The AEDPA "establishes a more deferential standard of review of state habeas judgments," *Fugate v. Head*, 261 F.3d 1206, 1215 (11th Cir. 2001), *cert. denied*, 535 U.S. 1104 (2002), in order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).  Several aspects of § 2254, as amended by the AEDPA, are relevant to a review of this Petition.

### A.  Cognizable Claims:

A federal court may entertain an application for a writ of habeas corpus, from a person in state custody pursuant to a state court judgment, only on the grounds that the petitioner is in custody in violation of the United States Constitution or the laws or treaties of the United States.  28 U.S.C. § 2254(a).  A claimed violation of state law is generally insufficient to warrant review or relief by a federal court under § 2254.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Cabberiza v. Moore*, 217 F.3d 1329, 1333 (11th Cir. 2000).  Questions of state law are only reviewed to determine whether the alleged errors rendered "the entire trial

fundamentally unfair." *Carrizales v. Wainwright*, 699 F.2d 1053, 1055 (11th Cir. 1983).

## B.   Exhaustion of State Remedies:

A petitioner, even when asserting grounds that warrant review by a federal court under § 2254, must have first raised such grounds before the state courts, thereby giving the state courts the initial opportunity to address the federal issues.  A § 2254 application cannot be granted unless a petitioner "has exhausted the remedies available in the courts of the State; . . ."  28 U.S.C.  2254(b)(1)(A).   This imposes a "total exhaustion" requirement in which all of the federal issues must have first been presented to the state courts. *Rhines v. Weber*, 544 U.S. 269, 274 (2005).

"[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition." *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). *See also Duncan v. Henry*, 513 U.S. 364, 365-66 (1995).  "A state prisoner seeking federal habeas relief cannot raise a federal constitutional claim in federal court unless he first properly raised the issue in the state courts." *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001). *See also Pruitt v. Jones*, 348 F.3d 1355, 1358-59 (11th Cir. 2003), *cert. denied sub nom. Pruitt v. Hooks*, 543 U.S. 838 (2004).  To properly exhaust a claim, a petitioner must present the *same* claim to the state court

that he urges the federal court to consider. *McNair v. Campbell*, 416 F.3d 1291, 1302 (11th Cir. 2005) (citations omitted); *Kelley v. Sec'y for the Dep't of Corr.*, 377 F.3d 1317, 1343-44 (11th Cir. 2004). As to ineffective assistance of counsel claims, a petitioner must have presented each instance of alleged ineffective assistance to the state court in such a manner that a reasonable reader would understand each claim's particular legal basis and specific factual foundation. *Ogle*, 488 F.3d at 1368 (citations omitted); *Kelley*, 377 F.3d at 1344-45. A state prisoner need not file a petition for certiorari with the U.S. Supreme Court, however, in order to exhaust state remedies because the U.S. Supreme Court is not considered to be a part of a "State's post-conviction procedures." *Lawrence v. Florida*, 127 S. Ct. 1079, 1083 (2007).

When presented with a "mixed" petition, i.e., one containing both unexhausted and exhausted claims, a district court is ordinarily required to either dismiss the petition, *Pliler v. Ford*, 542 U.S. 225, 227 (2004); *Rose v. Lundy*, 455 U.S. 509 (1982), or, in limited circumstances and under the district court's discretion, "grant a stay and abeyance to allow the petitioner to exhaust the unexhausted claim." *Ogle*, 488 F.3d at 1370 (citing *Rhines*, 544 U.S. at 277-79). However, when it is obvious that the unexhausted claims would be procedurally barred in state court due to a state-law procedural rule, the Eleventh Circuit has held that a district

court can consider the petition but treat those unexhausted claims as procedurally defaulted. *Ogle*, 488 F.3d at 1370. Additionally, while under the AEDPA a federal court may not grant a habeas petition that contains unexhausted claims, it may deny such a petition on the merits. *LeCroy v. Sec'y, Fla. Dep't of Corr.*, 421 F.3d 1237, 1261 n.26 (11th Cir. 2005).

"The teeth of the exhaustion requirement comes from its handmaiden, the procedural default doctrine." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001), *cert. denied*, 534 U.S. 1136 (2002). Under the procedural default doctrine, "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, . . .." *Smith*, 256 F.3d at 1138.

A procedural default for failing to exhaust state court remedies will only be excused in two narrow circumstances. First, a petitioner may obtain federal habeas review of a procedurally defaulted claim if he shows both "cause" for the default and actual "prejudice" resulting from the asserted error. *House v. Bell*, 547 U.S. 518, 536-37 (2006); *Mize v. Hall*, 532 F.3d 1184, 1190 (11th Cir. 2008). "Cause" ordinarily requires a petitioner to demonstrate "that some objective factor external to the defense impeded the effort to raise the claim properly in the state court." *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003) (quoting *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999).

-17-

Constitutionally ineffective assistance of counsel can constitute cause if that claim is not itself procedurally defaulted. *Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000). To show "prejudice," a petitioner must demonstrate that there is "at least a reasonable probability that the result of the proceeding would have been different." *Henderson*, 353 F.3d at 892.

Second, under exceptional circumstances, a petitioner may obtain federal habeas review of a procedurally defaulted claim, even without a showing of cause and prejudice, if such review is necessary to correct a fundamental miscarriage of justice. *House*, 547 U.S. at 536; *Edwards*, 529 U.S. at 451; *Henderson*, 353 F.3d at 892. This exception is only available "in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent." *Henderson*, 353 F.3d at 892. *See also House*, 547 U.S. at 536-37 (prisoner asserting actual innocence must establish that, "in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt") (citation omitted).

## C.  Claims Adjudicated in State Court

Even if a claim is federal in nature and has been properly exhausted, it is subject to additional restrictions under § 2254 that reflect a high level of deference to the state court's decision. *See*, *e.g.*, *Ferguson v. Culliver*, 527 F.3d 1144, 1146 (11th Cir. 2008). Habeas relief may not be granted with respect to

a claim adjudicated on the merits in state court unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). *See Brown v. Payton*, 544 U.S. 133, 141 (2005); *Price v. Vincent*, 538 U.S. 634, 638-39 (2003). A state court's summary rejection of a claim, even without explanation, qualifies as an adjudication on the merits which warrants deference. *Ferguson*, 527 F.3d at 1146; *Wright v. Sec'y for the Dep't of Corr.*, 278 F.3d 1245, 1253-54 (11th Cir. 2002). "Clearly established Federal law" consists of the governing legal principles, rather than the *dicta*, set forth in the decisions of the United States Supreme Court at the time the state court issues its decision. *Carey v. Musladin*, 549 U.S. 70, 74 , 127 S. Ct. 649, 653 (2006), citing *Williams v. Taylor*, 529 U.S. 362, 412 (2000). In cases where nothing in the Supreme Court's jurisprudence addresses the issue on point or the precedent is ambiguous and gives no clear answer to the question, it cannot be said that the state court's conclusion is contrary to, or constitutes an unreasonable application of, "clearly established Federal law." *Wright v. Van Patten*, 128 S. Ct. 743, 747 (2008); *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003).

A state court decision can be deemed "contrary to" the Supreme Court's clearly established precedents within the meaning of § 2254(d)(1) only if: (1) the state court applies a rule that contradicts the governing law as set forth in Supreme Court cases, or (2) the state court confronts a set of facts that is "materially indistinguishable" from those in a decision of the Supreme Court and yet arrives at a disparate result. *Brown*, 544 U.S. at 141; *Mitchell*, 540 U.S. at 15-16. Further, it is not mandatory for a state court decision to cite, or even to be aware of, the relevant Supreme Court precedents, "so long as neither the reasoning nor the result . . . contradicts them." *Early v. Parker*, 537 U.S. 3, 8 (2002); *Mitchell*, 540 U.S. at 16.

A state court decision involves an "unreasonable application" of the Supreme Court's precedents if the state court correctly identifies the governing legal principle but applies it to the facts of the petitioner's case in an objectively unreasonable manner, *Brown*, 544 U.S. at 134; *Bottoson v. Moore*, 234 F.3d 526, 531 (11th Cir. 2000), *cert. denied*, 534 U.S. 956 (2001); or, "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Bottoson*, 234 F.3d at 531 (quoting *Williams*, 120 S. Ct. at 1520). The "unreasonable application" inquiry "requires the state court decision to be more than

incorrect or erroneous"; it must be "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75-77 (2003) (citation omitted); *Mitchell*, 540 U.S. at 17-18.  Depending upon the legal principle at issue, there can be a range of reasonable applications. *Yarborough v. Alvarado*, 541 U.S. 652, 663-64 (2004).  Thus, the state court's decision is not subject to federal review *de novo*; rather, § 2254(d)(1) relief is only available upon a showing that the state court decision meets the "objectively unreasonable" standard.  *Id.* at 665-66.

A § 2254 petitioner can also obtain relief by showing that a state court decision "was based on an unreasonable determination of the facts in light of the evidence presented."  28 U.S.C. § 2254(d)(2).  Where the credibility of a witness is at issue, relief may only be granted if it was unreasonable, in light of the evidence presented, for the state court to credit the testimony of the witness in question.  *Rice v. Collins*, 546 U.S. 333, 338 (2006).  Additionally, a factual finding by a state court is presumed to be correct and a petitioner must rebut this "presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005); *Henderson*, 353 F.3d at 890-91.  This statutory presumption of correctness, however, "applies only to findings of fact made by the state court, not to mixed determinations of law and fact."  *Parker v. Head*, 244 F.3d 831, 836 (11th Cir.), *cert. denied*, 534 U.S. 1046

(2001) (citation omitted).  An ineffective assistance of counsel claim is a mixed question of law and fact; therefore, the presumption does not apply and such claims are reviewed *de novo*. *Rolling v. Crosby*, 438 F.3d 1296, 1299 (11th Cir.), *cert. denied sub nom. Rolling v. McDonough*, 126 S. Ct. 2943 (2006).

Finally, if the state court fails or declines to rule on the merits of a particular claim raised before it, that claim falls outside of the scope of § 2254(d)(1)'s restrictions and the reviewing federal habeas court owes no deference to the state court decision when evaluating that claim.  *Davis v. Sec'y for the Dep't of Corr.*, 341 F.3d 1310, 1313 (11th Cir. 2003).

## D.  Ineffective Assistance of Counsel

Ineffective assistance of counsel claims are reviewed under the standards established by 28 U.S.C. § 2254(d).  Newland v. Hall, 527 F.3d 1162, 1183 (11th Cir. 2008).  Post-AEDPA, the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), remains applicable to the claims of ineffective assistance of counsel raised in this case.  *Newland*, 527 F.3d at 1184.  In *Strickland*, the Supreme Court established a two-part test to determine whether a convicted person is entitled to habeas relief on the grounds that his or her counsel rendered ineffective assistance: (1) whether counsel's representation was deficient, i.e., "fell below an objective standard of reasonableness" "under prevailing professional norms," which requires a showing that "counsel made

errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"; and (2) whether the deficient performance prejudiced the defendant, i.e., there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, which "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687-88.  Petitioner bears a heavy burden to "prove, by a preponderance of the evidence, that counsel's performance was unreasonable." *Jones v. Campbell*, 436 F.3d 1285, 1293 (11th Cir. 2006), *cert. denied sub nom. Jones v. Allen*, 127 S. Ct. 619 (2006).  A Court must "judge the reasonableness of counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct," *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) (quoting *Strickland*, 466 U.S. at 690), applying a "highly deferential" level of judicial scrutiny. *Id.*  A court must adhere to a strong presumption that "counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.  An attorney is not ineffective for failing to raise or preserve a meritless issue. *Ladd v. Jones*, 864 F.2d 108, 109-10 (11th Cir.), *cert. denied sub nom. Ladd v. Burton*, 493 U.S. 842 (1989); *United States v. Winfield*, 960 F.2d 970, 974 (11th Cir. 1992) ("[A] lawyer's failure to preserve a meritless issue plainly cannot prejudice a client.").

**E.   Federal Evidentiary Hearing**

Petitioner requests an evidentiary hearing.  Petition at 7. Respondent submits that a federal evidentiary hearing is unnecessary in this case.  Response at 32.

Upon careful review of the record and, for the reasons set forth below, the Court concludes no evidentiary proceedings are required in this Court.  Schriro v. Landrigan, 550 U.S. 465, 127 S. Ct. 1933, 1939-40 (2007).  Petitioner does not proffer any evidence that would require an evidentiary hearing, Chandler v. McDonough, 471 F.3d 1360 (11th Cir. 2006), and the Court finds that the pertinent facts of the case are fully developed in the record before the Court. Schriro, 127 S. Ct. at 1940; Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003), cert. denied, 541 U.S. 1034 (2004).

## IV. Discussion

Respondent submits that Grounds One, Three, Four, and Five were not exhausted before the State courts and are now procedurally defaulted.  *See* Response at 39, 62, 65, 78.  The Court addresses each of these grounds in sequence and agrees with Respondent that Grounds One, Three, Four, and Five are procedurally defaulted. Next, the Court addresses Grounds Two and Six of the Petition on the merits and finds that the grounds do not satisfy § 2254.

**A.  Ground One: Ineffective Assistance for Failure to Investigate and Develop Voluntary Intoxication**

Petitioner alleges that trial counsel rendered ineffective assistance when he failed to investigate and then failed to present evidence that Petitioner was intoxicated at the time of the robbery and murder.  Petition at 4.  Specifically, Petitioner submits that Doctor Spellman, a defense expert appointed in the case, advised in his October 1, 1992 letter that Sliney had been "ingesting alcohol the night before the murder and was drunk the evening of his arrest."  *Id.*  Spellman also noted that Sliney's brother may have been an alcoholic.  *Id.*  Thus, Petitioner contends that trial counsel was on notice of a history of alcoholism in Sliney's family.  *Id.*  Petitioner further submits that trial counsel was also aware of Sliney's possible use of steroids.  *Id.* at 5-6. Petitioner faults trial counsel for failing to retain a mental health expert to assist him in determining the history and extent of Petitioner's alcoholism or steroid use.  *Id.*  In sum, Petitioner submits that had the jury been instructed on voluntary intoxication, it is reasonably probable that the jury would have instead returned a verdict of second-degree murder.  *Id.*

In Response, Respondent submits that ground one is not exhausted because Petitioner only raised this claim for relief in his post-conviction motion, which was denied, but did not include this claim on appeal.  Response at 43.  Therefore, Respondent argues that ground one is now procedurally defaulted.  *Id*. at 44.

Petitioner states that this claim was raised "in the appeal to the Florida Supreme Court." Petition at 7. Petitioner further states that Ground One was raised in his Rule 3.850 motion, but it was not "raised in any other petition, application or motion filed in the state court of Florida." *Id.* at 7-8. Respondent, in the alternative, reviews the post-conviction court's order denying Petitioner relief on this claim and submits that the court's solid reasoning denying Petitioner relief is why Petitioner decided not to appeal the denial of this claim to the Florida Supreme Court. *Id.* at 46.

    The Court agrees with Respondent that Petitioner did not exhaust Ground One and has now procedurally defaulted this claim. A review of the record shows that Petitioner only raised Ground One before the post-conviction court in his Consolidated Rule 3.850 Motion, Exh. C1 at 115-120, and did not raise it on appeal to the Florida Supreme Court. Exh. C6 at 953; Exh. C8.   In Florida, Petitioner should have appealed the post-conviction court's denial of Ground One in order to have exhausted one complete round before the State courts. *Doorbal v. Dep't of Corrections*, 572 F.3d 1222, 1229 (11th Cir. 2009)(finding that  petitioner's failure to appeal the denial of his ineffective assistance of counsel claim on the merits raised in capital habeas was procedurally defaulted); *Leonard v. Wainwright*, 601 F.2d 807, 808 (5th Cir. 1979)(per

curiam); *Williams v. McNeil*, Case No. 3:08-cv-908-J-20JRK, 2010 WL 1710839 *6 (M.D. Fla. Apr. 22, 2010).[13]

Although Petitioner filed an appeal of the post-conviction court's order of denial, he raised only two issues on appeal and did not raise Ground One.  On appeal, Petitioner referenced certain similar facts regarding his possible steroid and alcohol abuse, but these facts were raised in the context of Petitioner's ineffective assistance of penalty phase counsel for failing to develop and raise these mitigating factors, not guilt-phase counsel's failure to raise the voluntary intoxication defense.[14]  *See Kelley v. Sec'y Dep't of Corrections*, 377 F.3d 1317, 1343 (11th Cir. 2004)(noting that it is insufficient for purposes of exhaustion when the petitioner raises all of the facts necessary to support the claim before the state court, or that a somewhat similar state-law claim was made).  Therefore, Petitioner's claim that trial counsel rendered ineffective assistance for not submitting a voluntary intoxication defense has not been properly exhausted in state court, *Olge*, 488 F.3d at 1368, and federal remedies are no longer

_____

[13]Fifth Circuit decisions issued before October 1, 1981, are binding precedent.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc).

[14]As discussed in Ground Five, Petitioner never told either of his defense counsel that he used alcohol or steroids on the day of the murder.  Further, Petitioner's trial counsel testified during the evidentiary hearing that Petitioner's theory of defense was that his codefendant committed the murder.  Thus, the introduction of this jury instruction would have been inconsistent with the theory of his defense.

available.  *Smith*, 256 F.3d at 1138; *Snowden v. Singletary*, 135

F.3d 732, 736 n.4 (11th Cir. 1998).  Additionally, Petitioner has

failed to establish the exception to the exhaustion requirement:

that cause for the procedural default exists, that actual prejudice

results from the procedural default, or that review is necessary to

correct a fundamental miscarriage of justice resulting from failure

to consider the forfeited claims.   *Smith*, 256 F.3d 1138-39

(citations omitted).   The Court finds that Petitioner has

procedurally defaulted Ground One and it is therefore dismissed.

**B.  Ground Three- The trial court erred by unconstitutionally shifting the burden of proof in its instructions at sentencing**

Petitioner argues that the trial court erred during the

penalty phase when the judge unconstitutionally shifted the burden

of proof on the Petitioner in giving the follow jury instruction:

> Should you find sufficient aggravating circumstanced
> [sic] do exist, it will be your duty to determine whether
> mitigating circumstances exist that outweigh the
> aggravating circumstances.

Petition at 13. Petitioner also points out that in the court's

introduction of the jury instructions, the court stated:

> As you have been told, the final decision as to what
> punishment shall be imposed is the responsibility of the
> judge.  However, it is your duty to follow the law that
> will now be given to you by the court and render to the
> court an advisory sentence based upon our determination
> as to whether sufficient aggravating circumstances exist
> to justify the imposition of the death penalty and
> whether sufficient mitigating factors exist to outweigh
> any aggravating circumstances found to exist.

*Id.* Petitioner explains that the "gravamen" of his claim is that "the jury was told that death was *presumed* appropriate since aggravating circumstances were established, unless Petitioner proved that the mitigating circumstances outweighed the aggravating circumstances. *Id.* at 14. Petitioner also submits that during *voir dire* trial counsel failed to object when the prosecutor questioned potential jurors regarding the weight given to aggravating and mitigating circumstances. *Id.* at 15.

In Response, Respondent submits that Petitioner did not exhaust Ground Three before the State courts and it is now procedurally barred. Response at 71-72. Specifically, Respondent notes that Petitioner raised this claim of trial court error in his Consolidated Rule 3.850 Motion when it should have been raised on direct appeal. *Id.* at 72. In fact, Respondent states that the post-conviction court denied Ground Three as improperly raised in the Consolidated Rule 3.850 Motion when it should have been raised on direct appeal. *Id.* (citing Exh. C6 at 955). Petitioner acknowledges that he only raised Ground Three in his Rule 3.850 motion. Petition at 18. Respondent, additionally, turns to the merits of the claim, arguing that Petitioner "cites no controlling federal authority to show that Florida's standard penalty phase instructions on weighing aggravating and mitigating circumstances is constitutionally infirm." Response at 73. Respondent argues, in fact, that the United States Supreme Court in *Kansas v. Marsh,*

548 U.S. 163 (2006),[15] has foreclosed such a challenge to Florida's standard instruction on weighing the aggravating and mitigating factors.

The Court agrees with Respondent and finds that Ground Three was not exhausted and is now procedurally defaulted.  In denying Petitioner relief on Ground Three, the post-conviction court found:

> With regard to Ground III and collateral counsel's allegation that the trial court unconstitutionally shifted the burden of proof through its jury instructions during the penalty phase of the trial, the Court finds that this claim is not well taken.  The validity of jury instructions is a matter properly brought before the Florida Supreme Court on direct appeal, and not before this Court in the course of a post-conviction proceeding.

Exh. C6 at 955-956.  The post-conviction court correctly found pursuant to Florida law that Petitioner's substantive challenges to his jury instructions should have been raised on direct appeal. *Thompson v. State*, 759 So. 2d 650, 655 (Fla. 2000).  The State court's finding was based on an independent and adequate ground, and Petitioner does not argue otherwise. *Mason v. Allen*, ____F.3d _____, 2010 WL 1856165 *4 (11th Cir. 2010).  Petitioner's failure to properly raise Ground Three on direct appeal, and the State court's finding that the ground was improperly raised, results in

_____

[15]"[I]n *Walton*, the Court held that a state death penalty statute may place the burden of proof on the defendant to prove that mitigating circumstances outweigh aggravating circumstances." *Marsh*, 548 U.S. at 173 (discussing *Walton v. Arizona*, 497 U.S. 639 (1990) *over ruled on other grounds*, *Ring v. Arizona*, 536 U.S. 584 (2002)).

a procedural default of Ground Three.[16]   *See Smith v. Dugger*, 840 F.2d 787, 796 (11th Cir. 1988)(finding claims concerning jury instruction improperly raised in Rule 3.850 motion procedurally barred).   Additionally, Petitioner has failed to establish an exception to the exhaustion requirement: that cause for the procedural default exists, that actual prejudice results from the procedural default, or that review is necessary to correct a fundamental miscarriage of justice resulting from failure to consider the forfeited claims.   *Smith*, 256 F.3d at 1138-39 (citations omitted).   Accordingly, Ground Three is dismissed as procedurally defaulted.

## C. Ground Four- Trial counsel rendered ineffective assistance of counsel by failing to exercise jury challenge during *voir dire*

Petitioner argues that trial counsel rendered ineffective assistance by wasting peremptory challenges on two jurors, Mr. Walker and Ms. Lukas, instead of striking them "for cause." Petition at 19-20.   Additionally, Petitioner submits that trial counsel rendered ineffective assistance by failing to object when the prosecutor struck juror Noles for cause when this potential juror was qualified.   *Id.* at 20-21.

In Response, Respondent submits that Ground Four was not exhausted before the State courts and is now procedurally

---

[16]Further, as Respondent also notes, Petitioner failed to raise Ground Three on appeal to the Florida Supreme Court after the post-conviction court found the claim improperly raised.

defaulted.  Response at 74.  Respondent points out that Petitioner raised Ground Four in his Consolidated Rule 3.850 Motion, but did not appeal the denial thereof.  *Id.*  Petitioner acknowledges in his Petition that he only raised Ground Four in his post-conviction motion and did not seek further relief.  Petition at 21. Alternatively, Respondent argues that the claim lacks any merit because Petitioner "fails to show that a single objectionable juror actually sat on his jury."  Petition at 75.

The Court agrees with Respondent that Ground Four is not exhausted and is now procedurally defaulted.  Petitioner raised Ground Four in his post-conviction motion.  Exh. C1.  The post-conviction court denied Petitioner relief on this claim:

> <u>With regard to Claim IV</u> and collateral counsel's allegation that trial counsel failed to exercise jury challenges so as to ensure the integrity of the jury selection process, no evidence was presented by collateral counsel during the course of these evidentiary proceedings to support this claim.  As with the first two claims, the Court also notes again that no expert testimony was presented in support of the naked allegation that trial counsel's performance was deficient and that such deficient performance prejudiced the defense.  Put another way, collateral counsel [h]as failed to present competent substantial evidence to support this claim.

Exh. C6 at 956.  The record shows that Petitioner did not appeal the post-conviction court's order of denial of claim four.  *See* Exh. C8; Exh. C13.  As previously stated, according to Florida law, Petitioner should have appealed the post-conviction court's denial of this ground in order to exhaust his State remedies and the time

to do so has expired.  *Leonard*, 601 F.2d at 808; *see also Williams*, Case No. 3:08-cv-908-J-20JRK, 2010 WL 1710839 *6.[17]   Although Petitioner raised two other grounds on appeal from the post-conviction court's order of denial, he did not raise Ground Four on appeal.  *Doorbal*, 572 F.3d at 1229.  Therefore, this issue has not been properly exhausted in state court, *Olge*, 488 F.3d at 1368, and federal remedies are no longer available.  *Smith*, 256 F.3d at 1138; *Snowden v. Singletary*, 135 F.3d 732, 736 n.4 (11th Cir. 1998). Additionally, Petitioner has failed to establish an exception to the exhaustion requirement: that cause for the procedural default exists, that actual prejudice results from the procedural default, or that review is necessary to correct a fundamental miscarriage of justice resulting from failure to consider the forfeited claims. *Smith*, 256 F.3d 1138-39 (citations omitted).  The Court finds that Petitioner has procedurally defaulted Ground Four and it is therefore dismissed.

**D.  Ground Five- The cumulative effects of trial counsel's ineffective assistance and the trial court's errors resulted in an unreliable conviction**

Petitioner submits that the cumulative effect of all the grounds he raises in the Petition *sub judice* and grounds raised at different times in the post-conviction proceedings resulted in a

---

[17]Decisions from the Fifth Circuit Court of Appeals issued before October 1, 1981, are binding precedent on this Court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc).

violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights.  Petition at 21.  Specifically, Petitioner submits that Attorney Shirley's failure to investigate: possible defenses, the statutory and non-statutory mitigators; Attorney Shirley's failure to object during *voir dire*, failure to correct erroneous jury instructions that placed the burden on the Petitioner, failure to depose and interview witnesses, failure to move to change venue, and failure to properly participate in jury selection, violated *Strickland*.  *Id.* at 24.

In Response, Respondent submits that Ground Five was not properly exhausted before the State courts and is now procedurally defaulted.  Response at 77.  Specifically, Respondent points out that Petitioner's cumulative errors claim was raised in a post-conviction motion, but Petitioner did not pursue an appeal of the denial of the claim to the Florida Supreme Court.  *Id.*  Respondent additionally refers the Court to the post-conviction court's denial of this claim, in which the court found that there was no showing of deficient performance by counsel.  *Id.* at 78.

The Court agrees with Respondent that Ground Five is not exhausted and is now procedurally defaulted.  Petitioner raised Ground Five in his post-conviction motion.[18]  Exh. C1 at 145-146. The post-conviction court denied Petitioner relief on this claim:

[18]Ground Five *sub judice* was raised as Ground Six in Petitioner's post conviction motion.  Exh. C1 at 145-149.

> With regard to Claim VI and collateral counsel's
> assertions that the convictions are materially unreliable
> because there was 'no adversarial testing' due to a
> cumulative effects of ineffective assistance of counsel,
> the Court notes that this is the essence of the decision
> of the United States Supreme Court in Strickland v.
> Washington, and that it is collateral counsel's duty to
> assert that the cumulative effects of these allegedly
> deficient performances have resulted in a conviction that
> is materially unreliable.
>
> However, as has been noted with respect to each one of
> the preceding evidentiary claims, there has been no
> showing of a deficient performance by counsel.
> Therefore, it cannot logically follow that the cumulative
> effect of these allegedly deficient performances have
> produced an unjust result.

Exh. C6 at 957.  The record shows that Petitioner did not appeal the post-conviction court's order of denial.  *See* Exh. C8; Exh. C13.  As previously stated, under Florida law, Petitioner should have appealed the post-conviction court's denial of this ground in order to exhaust his State remedies and the time to do so has now expired.  *Leonard*, 601 F.2d at 808; *see also Williams*, Case No. 3:08-cv-908-J-20JRK, 2010 WL 1710839 *6.[19]  Therefore, this issue has not been properly exhausted in state court, *Olge*, 488 F.3d at 1368, and federal remedies are no longer available.  *Smith*, 256 F.3d at 1138; *Snowden*, 135 F.3d 732, 736 n.4 (11th Cir. 1998).  Additionally, Petitioner has failed to establish the exception to the exhaustion requirement: that cause for the procedural default

---

[19]Fifth Circuit decisions issued before October 1, 1981, are binding precedent on this Court.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc).

exists, that actual prejudice results from the procedural default, or that review is necessary to correct a fundamental miscarriage of justice resulting from failure to consider the forfeited claims. Smith, 256 F.3d 1138-39 (citations omitted). The Court finds that Petitioner has procedurally defaulted Ground Five and it is therefore dismissed.

**E.   Ground Two- Trial counsel, during the penalty phase, rendered ineffective assistance by failing to investigate, develop, and present evidence establishing compelling statutory and non-statutory mitigating factors**

Petitioner argues that appointed counsel for the penalty phase, Mark Cooper, rendered ineffective assistance when he failed to investigate and develop certain mitigating factors to present to the jury, such as, Petitioner's possible use of alcohol and steroids. Petition at 9. Petitioner attributes blame, in part, to his guilt-phase counsel, Kevin Shirley, for failing to develop the facts of Petitioner's possible substance abuse disorder and ignoring Doctor Spellman's report. *Id.* at 8-9. Petitioner specifically submits that his family "could have testified with regard to [his] history of alcohol abuse, the effect of alcohol on his personality and behavior, and the frequency of his alcohol abuse." *Id.* at 8. Petitioner, in fact, asserts that he used anabolic steroids the "evening before" the murder and "on the night of his arrest." *Id.* Maintaining his argument that his penalty-phase lawyer Mark Cooper rendered ineffective assistance during the penalty phase, Petitioner refers to Cooper's appointment on the eve

of the sentencing hearing and the fact that the court only gave Cooper a thirty-day continuance to prepare for the penalty phase hearing. *Id.* at 11.

In Response, Respondent notes that the post-conviction court denied Petitioner relief on this claim after the evidentiary hearing. Response at 48. The Florida Supreme Court affirmed the post-conviction court's order, agreeing that counsel's decision not to use expert testimony in this case was a reasonable, tactical decision. *Id.* Respondent quotes the extensive analysis in the State courts' orders and submits that "Petitioner fails to point to factual inaccuracies contained in the Florida Supreme Court's analysis of his ineffective assistance of counsel claims." *Id.* at 58. Respondent points out that Attorney Cooper *did* review reports from and consult with three doctors in this case, Doctors Spellman, Kling, and Silver, and, in fact, did not want a written report from Doctor Kling. *Id.* at 59 (emphasis added). Further, Respondent points out that the only expert in this case to testify was the State's witness, Doctor Silver, who examined Sliney at the request of Cooper and testified that Sliney only admitted to taking steroids twice. *Id.* at 51. Respondent submits that none of the three doctors who examined Sliney opined that extreme emotional disturbance, or any other "impaired" mitigators, applied to Sliney. *Id.* at 62.

As set forth above, Petitioner's ineffective assistance of counsel claim is governed by the standard set forth in *Strickland*. The Eleventh Circuit Court of Appeal has rejected the argument that the failure to present evidence of mitigating circumstances constitutes ineffective assistance *per se.* *Smith v. Dugger*, 840 F.2d 787, 795 (11th Cir. 1988). Specifically, the Court has recognized that "some so-called 'mitigating' evidence can actually have a negative impact on the jury." *Id.* While an attorney is required to conduct a "reasonable investigation" into possible mitigating evidence, *Elledge v. Dugger*, 823 F.2d 1439, 1455 (11th Cir.), *withdrawn in part on reh'g*, 833 F.2d 250 (11th Cir. 1987), counsel may limit presentation of mitigating evidence as a strategic decision. *Smith*, 840 F.2d at 795. "A tactical decision not to present mitigating evidence enjoys 'a strong presumption of correctness which is virtually unchallengeable.'" *Id.* (quoting *Clark v. Dugger*, 834 F.2d 1561 (11th Cir. 1987). *See also Davis v. Kemp*, 829 F.2d 1522 (11th Cir. 1987)).

The Court's review of the record shows that after holding evidentiary hearings, the post-conviction court entered an order denying Petitioner relief on Ground Two, and in summary reasoned as follows:

> With regard to Claim II and collateral counsel's claim that trial counsel failed to investigate, and present evidence of statutory and nonstatutory mitigating factors, once again, the Court finds that the Defendant has failed to demonstrate that counsel's performance was deficient, or that the alleged deficient performance

prejudiced the defense such that the result of this trial
has been rendered unreliable.

Again, counsel was hamstrung by the facts of the case the
actions of the Defendant himself.  The Court notes here
with particularity the testimony of Mr. Cooper in regard
to what he was told informally by Dr. Kling about his own
client.  Reduced to its essence, Dr. Kling essentially
described Mr. Sliney as a young man with a classic
sociopathic personality.  No evidence was presented by
collateral counsel to rebut the testimony of Mr. Cooper,
and both Mr. Shirley and Mr. Cooper had obtained opinions
of two psychologists and a psychiatrist in anticipation
of a possible penalty phase proceeding.

In addition, the Court will again note here that no
expert testimony was presented during the evidentiary
hearing held in this matter in support of the claim that
counsel failed to investigate, develop or present
evidence at the penalty phase proceeding.  In short,
there has been a complete failure of proof on this claim.

Exh. C6 at 954-955 (internal citations omitted).  Petitioner

appealed the post-conviction court's denial of Ground Two to the

Florida Supreme Court.

The Florida Supreme Court, reviewing the evidentiary

testimony, noted that Petitioner's penalty-phase counsel, Attorney

Cooper, testified that he consulted with several experts.  Exh.

C13, *Sliney*, 944 So. 2d at 283.  Petitioner was evaluated by a

Doctor Spellman before the penalty phase of the trial, although no

expert was called to testify at trial.  *Id.*  The Florida Supreme

Court took note of the expert reports written respectively by

Doctors Spellman and Silver, which were filed with the post-

conviction court.

Doctor Spellman's October 14, 1992 report, indicated that Petitioner told Doctor Spellman that he and Witteman were "hung over" when they entered the pawn shop.  Petitioner told Spellman that his memory of the crime was very limited.  While he reported using steroids, cocaine, marijuana, and quaaludes, he specifically told Doctor Spellman that he did not use those substances at the time of the murder.  Petitioner acknowledged that he had ingested a large quantity of alcohol within twenty four hours of the murder. Petitioner told Spellman that he was the only one in his family with an alcohol problem.  Doctor Spellman, however, suspected Petitioner's brother might have had alcohol problems as well.  In conclusion, the Florida Supreme Court noted that Doctor Spellman ended his report with a recommendation that defense counsel consult more experts about Petitioner's steroid use and other capital defense issues.

The Florida Supreme Court also took note of Doctor Silver's November 16, 1993 report, which referenced Doctor Spellman's report written approximately one-year before.  After listing what Petitioner told Doctor Spellman and what he told Doctor Silver, Silver opined that "Mr. Sliney adjusts the information he provides to suit his purposes.  Thus, one cannot know when or whether he is telling the truth."  The Florida Supreme Court's opinion quoted Doctor Silver's report as follows:

> What I did note during the interview was that his story
> had changed between the time he had talked with Dr.

> Spellman and the present interview.  Whereas before he
> said he had been doing steroids since age 18, this time
> he said he had planned to do steroids, but had never
> actually taken them before. Nonetheless, he said he did
> have steroids in his possession.  When asked why he told
> Dr. Spellman he used steroids, he said he had heard that
> things might go easier on him if he had a steroid
> problem.   This time around, he minimized any prior
> history of drug use.  While he admitted he might have
> been "pissed off or hung over" when he entered the murder
> victim's store, he said, "I wasn't drunk when I went into
> that store."

The Florida Court referenced Doctor Silver's additional thoughts that Sliney had "made a life out of creating the necessary appearances that would enable others to believe him."  Doctor Silver noted that "at his core" Petitioner was "basically hedonistic, exploitive, manipulative, and expedient," as well as "amoral."  Doctor Silver concluded that Sliney's actions were due to a character weakness and that he did not participate in the crime because of duress or because of any poor treatment in childhood.   The Florida Supreme Court took note of Doctor Silver's testimony at the evidentiary hearing, finding that he testified, consistent with his report, that Sliney told him that he had previously used steroids, but that he did not use steroids on the day of the murder, although he had consumed alcohol the night before.  Contrary to Doctor Spellman's interaction with Petitioner, Doctor Silver noted that Sliney was able to recall "in great detail" the events of the murder.  Doctor Silver stated at the hearing his opinion that Sliney only reveals information when it suits his purposes.

Thus, with regard to Petitioner's claim that counsel did not present expert testimony in mitigation, the Florida Supreme Court ruled, in pertinent part, as follows:

> We affirm the post-conviction court's denial of Sliney's claim that counsel was ineffective for failing to present expert testimony in mitigation.  We note that we recently considered a set of claims very similar to those presented here. . . . . . .
>
> The record in this case shows that the experts drew conclusions that would have been unfavorable for Sliney's presentation of mitigation.  Sliney did not demonstrate what mental mitigation his defense counsel could have put forth had Dr. Spellman, Dr. Silver, or any other expert testified.  There was no evidence that Sliney had any specific problems that would have mitigated against his sentence.  He points to Dr. Spellman's report that Sliney may have been suffering from psychoses and that he had blacked out at the time of the crime, but Sliney subsequently told Dr. Silver that he had lied to Dr. Spellman.  To have presented Dr. Spellman's report at the penalty phase, after Sliney fully described his recollection of the events during the guilt phase, would have caused him harm that would have outweighed any benefits of such evidence.
>
> The only evidence that Sliney can point to as mitigating from Dr. Silver's report were the conclusions that Sliney is immature and that he would have done well in a jail setting.  We do not find that defense counsel was deficient for electing not to present this evidence.  The remains of Dr. Silver's report was negative, and we agree that it was an acceptable strategy for defense counsel to elect not to present only part of a report and risk the admission of Dr. Silver's full opinion on cross-examination.  For these reasons, we find that defense counsel was not deficient for failing to present expert testimony in mitigation.

Exh. C13, *Sliney*, 944 So. 2d at 283 (internal citations omitted).

With regard to Petitioner's argument that his penalty-phase counsel was ineffective for failing to present evidence that

Petitioner abused steroids and alcohol, the Florida Supreme Court took note, *inter alia*, of Sliney's testimony during the evidentiary hearing held before the post-conviction court, in which Sliney testified that he abused steroids and alcohol. Sliney's mother and brother also testified regarding Sliney's alcohol and steroid use. Sliney testified that he repeatedly told his attorneys about his steroid use. Both Attorneys Shirley and Cooper testified that Petitioner told them that he had only used steroids once or twice and that he never informed them that he used steroids or alcohol on the day of the crime. Based on the foregoing, the Florida Supreme Court affirmed the post-conviction court's order of denial, finding:

> We agree with the trial court's finding that counsel was not deficient for failing to investigate or present this potential mitigation evidence. Sliney repeatedly represented to his counsel and Dr. Silver that he did not abuse steroids and that, at most, he had tried them once or twice. Even though steroids were reportedly found in his possession when his residence was searched, he insisted that he kept steroids in his possession only because he sold them. Sliney did tell Dr. Spellman that he used steroids, but he then told Dr. Silver that he had lied to Dr. Spellman because he heard that drug use would help his defense. Counsel had no reason to investigate whether Sliney used steroids or whether any drug or alcohol abuse was relevant to the murder because Sliney never indicated that steroids or alcohol were in any way involved in his actions on the day of the murder.
>
> In addition, Cooper repeatedly testified at the hearing that his approach at the penalty phase was to portray Sliney as a "good, clean-cut kid." Evidence of steroid and alcohol abuse would have directly conflicted with this valid and effective mitigation strategy.

Exh C13, *Sliney*, 944 So. 2d at 284 (internal citations omitted).

With regard to Petitioner's argument that penalty-phase counsel was ineffective for failing to present mitigating evidence of his family's alcohol abuse, the Florida Supreme Court again affirmed the post-conviction court's denial, finding:

> We find no error in the trial court's determination that counsel's failure to investigate and present this information was not deficient. The family portrayed themselves at all times to trial counsel as loving and supportive. There was no presentation, even at the post-conviction hearing, that the family was anything but loving and supportive despite their alcohol use. At no point has Sliney shown that his family's alcohol consumption negatively affected him . . . . .

> Even though counsel at Sliney's trial presented little evidence in mitigation, it appears that he presented nearly all available evidence. Post-conviction counsel presented no witnesses that did not testify at the penalty phase, and we conclude that none of their additional testimony would have affected the outcome of the sentencing recommendation. The evidence presented below was neither qualitatively nor quantitatively better than the evidence actually presented at the penalty phase.

> Thus we conclude that even if Cooper's actions had been deficient in his handling of the investigation and presenting of mitigating evidence, we find that these actions did not prejudice Sliney. Nothing was presented at the evidentiary hearing that undermines our confidence in the outcome of Sliney's sentencing proceeding. Sliney has simply failed to carry his burden on this issue because he put forth no other mitigation evidence that penalty-phase counsel was unaware of or should have presented that could have reasonably resulted in a different verdict.

Exh. C13, *Sliney*, 944 So. 2d at 285-286 (internal citations omitted).

The Florida Supreme Court correctly recognized the proper legal standard of review, i.e., the *Strickland* standard. Indeed, counsel had a duty to conduct a reasonable investigation before making a strategic decision, <u>Wiggins v. Smith</u>, 539 U.S. 510, 521-23 (2003), and "the court must consider . . . whether the known evidence would lead a reasonable attorney to investigate further." *Id.* at 527. The Florida Supreme Court's decision was not contrary to this clearly established federal law. Contrary to Petitioner's assertion that counsel did not conduct any meaningful investigation, the record evidences that both Kevin Shirley and Mark Cooper conducted a reasonable investigation. Moreover, "the scope of the duty to investigate mitigation evidence is substantially affected by the defendant's actions, statements, and instructions." *Cummings v. Sec'y Dep't of Corrections*, 588 F.3d 1331, 1356 (11th Cir. 2009). In this case, the record evidences that Petitioner told his counsel he was not under the influence of steroids or alcohol on the day of the murder and counsel proceeded accordingly.

At the outset, the Court notes that Attorney Mark Cooper was Petitioner's first appointed defense counsel and proceeded through "extensive" discovery, until his discharge and substitution of counsel on or about January 22, 1993. Exh. C6 at 945. Because of Cooper's caseload, Petitioner's family hired Kevin Shirley to take his place. *Id.* Kevin Shirley represented Petitioner during the

guilt phase of the trial.  Petitioner fired Kevin Shirley at the
conclusion of the guilt phase on September 30, 1993.  *Id.*  On
October 4, 1993, the court re-appointed Mark Cooper to represent
Petition for the penalty phase.  *Id.; see also* Exh. C14 at 302-305.

During the guilt phase of the trial, Petitioner maintained
that his co-defendant committed the murder and that he was
dominated by codefendant.  Thus, Attorney Shirley reasonably
decided not to pursue either a steroid rage or alcohol ingestion
defense because Petitioner was maintaining a different theory of
defense-that he did not commit the murder.  *Id.*  Doctor Spellman
could not have testified because Petitioner's statements to
Spellman were inconsistent with this theory of defense.  One of the
few consistencies between Doctor Spellman's October 14, 1992 report
and Doctor Silver's November 16, 1993 report was that Petitioner
reported that he did not use any substances, either steroids or
alcohol, on the day of the murder.  The Florida Supreme Court also
decided that Attorney Cooper's decision not to call the experts
during the penalty phase of the trial correlated with his sound
strategy of portraying Petitioner as an "all-American," good kid.
Additionally, had Cooper introduced part of a report, he would have
risked introduction of the entire report, which, as summarized
above, was overall damaging to Petitioner.[20]  Counsel complied with

---

[20]In fact, Cooper requested an oral report from another expert,
Doctor Kling, which was also unfavorable.  Based on Doctor Kling's
(continued...)

their duty to make reasonable investigations and made reasonable decisions that further investigation into the Petitioner's use of steroids and alcohol was unnecessary. *See Powell v. Allen*, _____ F.3d _____, 2010 WL 13181649 *6-*8 (11th Cir. 2010).   The Court finds that the Florida Supreme Court's decision was not an unreasonable application of *Strickland*.

Additionally, the Court finds that the Florida Supreme Court's decision did not involve an unreasonable determination of the facts.   The record fully supports the State courts' factual findings.   In particular, the Florida Supreme Court's finding that counsel's decision not to rely on the experts' reports was a tactical decision is a finding of fact, entitled to the presumption of correctness only rebutted by clear and convincing evidence. *Bolendar v. Singletary*, 16 F.3d 1547, 1558 (11th Cir. 1994).   The Court agrees with Respondent that Petitioner submits no reason, much less clear and convincing evidence, to question the State courts' validity.

The Florida Supreme Court's decision was not contrary to, or an unreasonable application of, this clearly established federal law.   The Florida Supreme Court's decision did not involve an

---

[20](...continued)
evaluation, Kling reported that Sliney was "secretive and amoral," that he had "no internal moral constraints," that he remembered everything about the crime, that he "does what he wants" and is a "wheeler, dealer . . ." and "a classic con man" with "no goals." Exh. C6 at 946.

unreasonable determination of the facts. Therefore, Petitioner is denied relief on Ground Two.

**F. Ground Six- Trial counsel rendered ineffective assistance due to an actual conflict of interest that adversely affected his performance**

Petitioner alleges that Kevin Shirley rendered ineffective assistance because he was operating under a conflict of interest. Petition at 24. Petitioner submits that Attorney Shirley represented one of the State's key witnesses, Detective Lloyd Sisk, in a civil proceeding in 1988. *Id.* at 25. Petitioner also submits that Attorney Shirley represented Detective Sisk in a second civil proceeding, his divorce proceeding, in 1990, and Sisk's son in his divorce proceeding, which took place during Petitioner's criminal trial. *Id.* Petitioner states that during the motion to suppress his confession, Shirley had to cross-examine two of the State's witnesses, Detectives Twardzik and Sisk, and again cross-examined them at trial. *Id.* at 26-27. Petitioner argues that Shirley could not conduct a proper cross-examination of Sisk based on his prior representation, resulting in the court's denial of the motion to suppress. *Id.* Petitioner acknowledges that he raised this claim before the State courts and avers that the record does not support the post-conviction court's denial. *Id.* at 34. In particular, Petitioner argues that it is "unclear what 'expert testimony' the trial court expected, none was offered because this claim did not require expert testimony." *Id.*

Respondent disagrees with Petitioner's argument, first submitting that Petitioner "fails to point out any factual inaccuracies in the state court's analysis." Response at 85. Respondent submits that during the evidentiary hearing held before the State post-conviction court, Petitioner failed to present evidence establishing a conflict of interest between Shirley and Corporal Sisk, instead presenting testimony only from Petitioner. *Id.* at 87. Respondent submits that Petitioner never called Attorneys Sisk or Shirley to testify during the evidentiary hearing, and, as such, failed to develop the extent of the attorney-client relationship for the record. *Id.* Specifically, Respondent argues there is no support for Petitioner's argument that "Shirley was forced to choose between discrediting his former client through information learned in confidence, or foregoing vigorous cross-examination in an attempt to preserve Sisk's attorney-client privilege." *Id.* at 93-94. Further, Respondent avers that Shirley was not actively representing conflicting interests because the representation of Sisk occurred years before Petitioner's trial. With regard to Shirley's representation of Sisk's son, Petitioner submits that there was no finding by the post-conviction court that the person Petitioner claimed to be Sisk's son was in fact Sisk's son. *Id.* at 97.

The record shows that the post-conviction court denied Petitioner relief on this ground, finding as follows:

> With regard to the supplementary claim and collateral
> counsel's allegation that trial counsel had a conflict of
> interest through his prior representation of Detective
> Sisk, the Court finds that there was no 'actual conflict
> of interest,' as contemplated by the Sixth Amendment of
> the United States Constitution.  As stated by the United
> States Supreme Court in Mickens v. Taylor, an 'actual
> conflict of interest' is a conflict of interest that
> adversely affects counsel's performance.
>
> The Court has thoroughly reviewed counsel's cross-
> examination of Detective Sisk at trial, and finds that
> there is no evidence to support a claim that Mr.
> Shirley's prior representation of Detective Sisk
> adversely affected his performance.  See also, Hunter v.
> State, supra.
>
> In addition, as with the other claims, collateral counsel
> failed to present any expert testimony in support of the
> bare allegation that counsel had a conflict of interest
> that was undisclosed and that adversely affected his
> performance.  In fact, collateral counsel did not even
> present testimony from Mr. Shirley on this point,
> although he had every opportunity to do so.

Exh. C6.

Petitioner appealed the post-conviction court's denial of his

claim to the Florida Supreme Court.  The Florida Supreme Court also

noted that the only testimony Petitioner presented at the

supplementary evidentiary hearing concerning this claim was his

own.[21]  *Sliney*, 944 So.2d at 278, Exh. C13.  At the hearing, Sliney

testified that he did not know of Shirley's previous representation

---

[21]The Florida Supreme Court also noted that in a previous,
unrelated supplementary post-conviction hearing, Shirley was asked
whether he previously had represented Detective Sisk.  Shirley
responded that he had represented Sisk in the past, but his prior
representation did not influence his decision not to depose Sisk.
No other questions were asked regarding Shirley's representation of
Sisk.  *Sliney*, at 278, Exh. C13.

of Detective Sisk. *Id.* Sliney also claimed that, despite his requests, Shirley failed to address several inconsistent statements that Detective Sisk purportedly made when testifying during the trial. *Id.* In denying Petitioner relief on this claim, the Florida Supreme Court found:

> The record does indicate that prior to representing Sliney, Shirley represented Detective Sisk in a civil lawsuit and a marriage dissolution proceeding. These representations occurred in 1988 and 1990, respectively, and concluded before Shirley undertook his representation of Sliney. A defense attorney's prior representation of a state witness could establish a basis for a conflict because a state witness will be testifying against the attorney's current client. . . . Thus, a potential conflict was demonstrated at the hearing below because Shirley represented both Sliney and Detective Sisk, and Detective Sisk testified on behalf of the State at Sliney's trial.
>
> However, for post-conviction relief, the record must demonstrate that this prior representation adversely affected Shirley's performance at trial. . . . . Sliney has failed to show how Shirley's prior representation of Detective Sisk adversely affected his representation of Sliney. Detective Sisk was called by the State during the trial proceedings to testify twice, once at Sliney's motion to suppress hearing on August 17, 1993, and once in rebuttal on September 30, 1993. Detective Sisk was only called in rebuttal at trial to counter Sliney's testimony and the testimony of defense witnesses that Sliney was intoxicated on the day he was arrested. Having reviewed Shirley's cross-examinations of Detective Sisk, we find that there is no evidence that Shirley's representation of Sliney was affected by any potential conflict. Sliney testified at the evidentiary hearing that he passed several notes to Shirley about inconsistencies in Detective Sisk's rebuttal testimony that Shirley refused to bring out in the cross-examination of Sisk, including the subject of Sliney's intoxication during his interrogation. The circuit judge, in his order denying the post-conviction motion, sets forth Sliney's testimony as to the issues Sliney wanted brought out and that Sliney claims were missing in

Detective Sisk's testimony.  But Sliney did not testify as to the substance of any matters that he contended should have been brought out in cross-examination at the supplementary evidentiary hearing that were not.  To the contrary, Sliney acknowledged that all of the information Sliney wanted brought out had been addressed at trial, including the allegations that he was intoxicated at the time of his confession.  Sliney did not call Shirley or Detective Sisk at the hearing.  Sliney's testimony is the only evidence in respect to what Shirley should have done in this cross-examination that was not done.  We find no error in the trial court's denial of relief on this basis.

Alternatively, Sliney argues that this conflict adversely affected him because Shirley probably knew some information about Detective Sisk that could have been used to impeach him but that Shirley could not use the information because it was privileged information. Critically, Sliney has failed to present any evidence that Shirley knew anything that he could have used to impeach Detective Sisk.  Although Sliney argues that as Detective Sisks' counsel Shirley must have learned something that could have been used against Detective Sisk, this argument is merely speculative. . . . . While Sliney argues that Shirley would have refused to divulge that he had any impeaching information had he testified at the supplementary hearing, it was incumbent on Sliney to demonstrate that an actual conflict occurred.  Sliney failed to establish a basis for relief in this post-conviction claim.

Sliney also argues that Shirley was ineffective because he simultaneously represented Detective Sisk's son in a divorce proceeding at the time of Sliney's trial. However, the only evidence that Sliney presented on this issue was a divorce proceeding in the name of Jeffery Sean Sisk, dated February 9, 1993.  Sliney presented no evidence that this person was related to Detective Sisk. More importantly, Sliney presents no evidence his interests and those of Jeffery Sisk would have conflicted in such a way that Shirley's representation of Sliney was adversely affected.

Thus, we affirm the trial court's determination on this issue.

*Sliney*, 944 So. 2d at 278-281, Exh. C13

The Florida Supreme Court properly recognized both requisite elements for stating an ineffective assistance of counsel claim stemming from a conflict of interest.  To establish an ineffective assistance of counsel claim based on a conflict of interest, Petitioner must demonstrate an actual conflict of interest that adversely affected his lawyer's performance.  *Lightbourne v. Dugger*, 829 F.2d 1012, 1023 (11th Cir. 1987)(other citations omitted).  "A possible, speculative or merely hypothetical conflict does not suffice."  *Id.* (citations omitted).  "'[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance.'"  *Lightbourne*, 829 F.2d at 1023.  Once Petitioner demonstrates an actual conflict of interest, then Petitioner "must also show that this conflict had an adverse effect upon his lawyer's representation."  *Id.*

In this case, Petitioner has presented no evidence indicating that counsel ever simultaneously represented Detective Sisk and himself.  Petitioner acknowledges that counsel represented Sisk in civil proceedings in 1988 and 1990, and his representations ended before he began representing Sliney in his criminal trial.  Thus, the Court will treat this case as one of successive representation, rather than simultaneous representation.[22]  The Eleventh Circuit has

---

[22]Even if the Court presumes that counsel was representing
(continued...)

-53-

acknowledged that it may be more difficult to prove that a successive representation caused an actual conflict of interest than a simultaneous representation. *Freund v. Butterworth*, 165 F.3d 839, 859 (11th Cir. 1999)(en banc)(citations omitted).

In a successive representation case, "[a]n 'actual conflict of interest occurs when a lawyer has 'inconsistent interests.'" *Freund*, 165 F.3d at 859 (quoting *Smith v. White*, 815 F.2d 1401, 1405-06 (11th Cir. 1987). "In order to provide that an 'actual conflict' hindered petitioner's lawyer's performance, petitioner 'must make a factual showing of inconsistent interests' or point to 'specific instances in the record' to suggest an actual impairment of his or her interests." *Freund*, 165 F.3d at 859 (other citations omitted). "At a minimum, petitioner must 'show that *either* (1) counsel's earlier representation of the witness was substantially and particularly related to counsel's later representation of [petitioner], *or* (2) counsel actually learned particular confidential information during the prior representation of the witness that was relevant to [petitioner's] later case.'" *Id.* (citations omitted)(emphasis in original). However, proof of both substantial relatedness and confidential information may not be

_____

[22](...continued)
Sisk's son in a divorce proceeding while Petitioner's criminal trial was occurring, these facts do not give rise to a simultaneous representation case. Moreover, the State courts did not make a factual finding that the alleged person was Sisk's son because Petitioner did not present any evidence to the State court on this matter.

enough to demonstrate "'inconsistent interests' in a successive representation case." *Id.* (citations omitted).  In pertinent part, "the 'actual conflict' inquiry is fact-specific, consistent with the petitioner's ultimate burden 'to prove that his conviction was unconstitutional.'" *Id.*

Here, as the Florida courts recognized, Petitioner has alleged a potential conflict of interest because counsel was put in a position where he had to cross-examine his former client. *Lightbourne*, 829 F.2d at 1023 (citation omitted)(noting potential conflict when attorney had to cross-examine his former client). The record evidence shows, however, that counsel's former client, Detective Sisk, was not the lead detective in the case against Sliney.   Detective Sisk's activity in the case consisted of assisting with Petitioner's arrest and being present for the initial part of Sliney's confession.   Exh. A11 at 1175.   Sisk's participation at trial was even more limited as he was called only as a rebuttal witness to testify about Sliney's appearance at the time of his arrest and whether he appeared intoxicated at that time.  *Id.* at 1169-1175.  Sisk testified that Sliney did not appear intoxicated during the arrest and was not physically ill while at the police station.   On cross-examination, counsel elicited testimony from Sisk in which Sisk admitted that he was not in the interview room during Petitioner's taped statement and was not present with Sliney at all times during the morning of his arrest.

Exh. A11 at 1174-1175.  Thus, Sisk was not a critical witness to the State's case and merely provided cumulative testimony to that offered by Detective Twardzick regarding Sliney's appearance.

Indeed, counsel had previously represented Sisk in civil matters: first, a lawsuit concerning reinstatement of his employment, and then a divorce proceeding.  The Court presumes that Detective Sisk shared confidential information with his counsel during these proceedings related to the subject of his representation.  However, Sisk's civil cases had no relation whatsoever to Petitioner's trial.  Any information counsel learned about Sisk before representing Sliney was entirely irrelevant to Sliney's case.  Moreover, as the State court found, Petitioner failed to present any evidence to show that the cases were substantially and particularly related, because the only testimony collateral counsel elicited during the hearing was Petitioner Sliney's testimony.  While Petitioner now submits that he is unsure what "expert" testimony he should have presented to the post-conviction court, the Court's review of the record shows that the post-conviction court merely pointed out that Petitioner failed to present testimony from Attorney Shirley on the matter.  Significantly, collateral counsel never elicited testimony from either Attorney Shirley or Detective Sisk during the evidentiary hearing about the scope and nature of counsel's prior representation of Sisk.  Thus, the Court finds that counsel's

earlier representations of Sisk were not substantially and particularly related; and, as such, counsel was not operating under an actual conflict of interest.

Assuming only *arguendo* that an actual conflict of interest existed in this case, Petitioner was also required to establish that the conflict caused an adverse effect on his representation. In denying Petitioner relief on this claim, the Florida courts focused on Petitioner's failure to establish an adverse effect. "Adverse effect" has three necessary elements that a petitioner must establish:

> First, he must point to 'some plausible alternative defense strategy or tactic [that] might have been pursued. . . . . Second, he must demonstrate that the alternative strategy or tactic was reasonable under the facts. Because prejudice is presumed, . . . . the petitioner 'need not show that the defense would necessarily have been successful if [the alternative strategy or tactic] had been used, 'rather he only need prove that the alternative 'possessed sufficient substance to be a viable alternative.' . . . . Finally, he must show some link between the actual conflict and the decision to forego the alternative strategy of defense. In other words, 'he must establish that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.' . . . .
>
> It bears repeating, however, that '[p]rejudice is presumed only if the defendant demonstrates that . . . 'an actual conflict of interest' adversely affected his lawyer's performance.'

*Freund*, at 861.

Petitioner argues that Shirley did not cross-examine Sisk on matters Petitioner brought to his attention during trial because he

-57-

was operating under a conflict of interest.  The State courts determined that Petitioner failed to show an adverse effect because Petitioner did not testify to the substance of the matters he requested counsel to raise during the cross-examination of Sisk, which he alleges counsel failed to raise.  Instead, the Florida Supreme Court noted that Petitioner acknowledged that counsel brought out all of the allegations he wanted, including allegations that he was intoxicated at the time of his confession. The record evidence does not show that counsel was impaired in his ability to cross-examine Sisk because of his prior representation of the rebuttal witness.

The Florida Supreme Court's decision was not contrary to, or an unreasonable application of, this clearly established federal law.  The Florida Supreme Court's decision did not involve an unreasonable determination of the facts.  Therefore, Petitioner is denied relief on Ground Six.

ACCORDINGLY, it is hereby

**ORDERED AND ADJUDGED:**

1.   The Florida Attorney General is **dismissed** as a named Respondent.

2.   Grounds One, Three, Four, and Five of the Petition are **dismissed with prejudice** as procedurally defaulted.

3.   Grounds Two and Six of the Petition are **denied** on the merits **with prejudice.**

4.   The Clerk of Court shall terminate any pending motions, enter judgment accordingly, and close this case.

### CERTIFICATE OF APPEALABILITY AND
### LEAVE TO APPEAL *IN FORMA PAUPERIS* DENIED

**IT IS FURTHER ORDERED** that Petitioner is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a certificate of appealability (COA). Id. "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." Id. at § 2253(c)(2). To make such a showing, petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003). Petitioner has not made the requisite showing in these circumstances. Finally, because Petitioner is not entitled to a certificate of appealability, he is not entitled to appeal *in forma pauperis*.

**DONE AND ORDERED** in Fort Myers, Florida, on this 22nd day of June, 2010.

Charlene Edwards Honeywell
United States District Judge

SA: alj
Copies: All Parties of Record